**Charles LeRoy ALSAGER, Sr., and Darlene Lauvern Alsager, Plaintiffs,**

v.

**DISTRICT COURT OF POLK COUNTY, IOWA (JUVENILE DIVISION), et al., Defendants.**

Civ. No. 73–79–2.

United States District Court, S. D. Iowa, C. D.

Dec. 19, 1975.

Gorden E. Allen, Iowa Civil Liberties Union, Des Moines, Iowa, and Rena K. Uviller, Burt Neuborne, Melvin L. Wulf, Juvenile Rights Project, American Civil Liberties Union, New York City, for plaintiffs.

Ray A. Fenton, Polk County Atty., and Harold A. Young, Asst. Polk County Atty., Des Moines, Iowa, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

HANSON, Chief Judge.

In May of 1970, the Juvenile Division of the District Court of Polk County entered an order terminating the parental rights of Charles and Darlene Alsager "in and to" five of their six children. In March of 1973, this action was brought attacking the constitutionality of those termination proceedings. The Alsagers seek a declaratory judgment to the effect that Iowa's parent-child termination statute is unconstitutional both on its face, and as it was applied to them. Plaintiffs also complain of alleged procedural defects in the state termination proceedings, and seek monetary damages from the defendants. Their complaint is based on 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. § 1343(3).

Evidence was presented to this Court, sitting without a jury, in March of 1974. In November, 1974, the Court ruled that the factual situation faced by the plaintiffs was such that federal declaratory relief would be inappropriate. *See* 384 F.Supp. 643. This ruling was greatly influenced by the Court's fervent belief that the interests of the five children involved in this case could be best served by further proceedings, formal or informal, on the state level. On June 17, 1975, the United States Court of Appeals for the Eighth Circuit ruled that this refusal to proceed to the merits of the plaintiffs' constitutional claims was error. 518 F.2d 1160 (8th Cir. 1975). The case was then remanded to this Court for proceedings consistent with that opinion. Accordingly, the Court acts today, under a mandate.

The Court of Appeals has specifically directed this Court to examine the question of mootness before addressing the merits of plaintiffs' constitutional

claims. 518 F.2d at 1167. On September 11, 1975, this Court held a brief hearing on the mootness issue. All parties agreed at that time that the issues presented by the plaintiffs remain ripe for adjudication, and this Court so finds. *See* transcript of September 11, 1975 hearing, at 26–29. The possibility of mootness was apparently triggered by statements before the appellate court to the effect that the five Alsager children might be returned to their parents. 518 F.2d at 1166. The Court has been informed, however, that any such return[1] would be probationary only. Thus, the legal issue raised by this constitutional challenge would remain alive absent a declaration from this Court, for the exact nature of the Alsagers' legal relationship to their children would still be in doubt. Only a ruling as to the validity of the 1969–1970 termination proceedings will serve to "clear the air" and clarify the role the Alsagers are to have in the future upbringing of their children. *See generally Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974).

Before discussing the merits of the Alsagers' constitutional contentions, the Court will reiterate the Findings of Fact made in its prior ruling.

Charles and Darlene Alsager were residing at 614 East 30th Street, Des Moines, Iowa, in the summer of 1969. At that time Mr. Alsager was 36 years old, and Mrs. Alsager was 26 years old. The couple had been married eleven years and were the parents of six children: George, who was 10 in June of 1969; Wanda, who was 8; John, age 7, Charles, Jr., age 6; Michael, age 4; and Albert, who was less than one year old.

The Alsagers began to have contact with the juvenile authorities of the Polk County District Court as early as 1965, when George was adjudicated to be a "neglected child." This adjudication prompted a removal of George from his parents' home, and he was placed in at least two foster homes before he was returned to his parents in 1968.

In the spring and early summer of 1969, the probation department of the Polk County District Court received a number of complaints about the Alsager children from the family's neighbors. On June 13, 1969, Carl Parks, the Chief Probation Officer of the Polk County District Court, wrote a letter to the plaintiffs stating that his office had received a report about their children, and warning the parents that a petition might be filed by the neighbors seeking to remove the children from their custody.

On June 20, 1969, Jane Johnston, a probation officer with the Polk County Juvenile Court, visited the Alsager home. Miss Johnston spent approximately twenty minutes inside the Alsager residence, which at the time was occupied only by Mrs. Alsager and the baby, Albert. Based on her observations inside the house, and without seeing the other five children, Miss Johnston determined that all six children should immediately be removed to the Polk County Juvenile Home. This removal was to be temporary, pending a hearing to determine whether the children were "neglected" as defined by Section 232.2(15) of the Code of Iowa (1973). This hearing was held within one week from the initial removal, on June 26, 1969. As a result of the hearing, Polk County District Judge Don L. Tidrick found the children to be neglected, and ordered that they remain in the custody of the county court pending placement in a foster home or an institution.

Less than one month after the neglect ruling, Chief Probation Officer Parks filed a petition to institute proceedings to terminate the parent-child relationship in Polk County District Court.

This petition alleged that

the best interests of the children . . require that the parent-child relationships . . . be terminated by the

---

1. As far as the record reflects, most if not all of the five children are still separated from their parents.

Court because said parents have substantially and continuously and repeatedly refused to give their children necessary parental care and protection and because said parents are unfit parents by reason of conduct detrimental to the physical or mental health or morals of their children.

Upon a filing of the petition, a guardian ad litem was appointed in behalf of the children. A copy of the petition was served upon the parents, who then retained counsel. On September 9, 1969, a termination hearing was held before Judge Tidrick. The parents were present at this hearing, accompanied by their counsel. The children's guardian ad litem was also present. On September 29, 1969, Judge Tidrick issued an order pertaining to the termination hearing. The judge stated that "adequate and sufficient cause" existed to terminate the parent-child relationship, but he declined to do so at that time, stating that "final termination of parental rights should not take place so long as there is any substantial hope that the parents will be able to improve to the extent that they can provide even minimal care." The order then continued the matter of termination of the parental rights. The two eldest children, George and Wanda, were released to the temporary custody of their parents. The four youngest children were ordered to remain in the custody of the court.

The court held a second hearing on the matter of termination on March 19, 1970. One week prior to this hearing the attorney who represented Charles and Darlene Alsager at the September proceedings was appointed to represent them at the March hearing. A final hearing on termination was held on May 22, 1970. On that day, Judge Tidrick issued his final termination order. He ruled that Wanda, who had been returned to her parents in September, would benefit by remaining in her parents' home. The Alsagers' parental rights "in and to" the other five children were terminated. This order of termination was affirmed by the Iowa Supreme Court on October 18, 1972, in a short opinion. *See State v. Alsager,* 201 N.W.2d 727 (Iowa 1972). No further proceedings were commenced on the state level subsequent to the decision of the Iowa Supreme Court. This lawsuit was instituted on March 28, 1973.

## CONCLUSIONS OF LAW

Plaintiffs' amended complaint asserts that their legal relationship to their children has been terminated pursuant to standards and procedures which violate the First, Ninth, and Fourteenth Amendments to the United States Constitution. The plaintiffs seek a declaratory judgment to the effect that the Iowa statute which permitted the termination of their parent-child relationships is unconstitutional both on its face and as applied. The parental termination statute of the Code of Iowa, § 232.41, provides:

The court may upon petition terminate the relationship between parent and child:

\* \* \* \* \* \*

2. If the court finds that one or more of the following conditions exist:

a. That the parents have abandoned the child.

b. That the parents have substantially and continuously or repeatedly refused to give the child necessary parental care and protection.

c. That although financially able, the parents have substantially and continuously neglected to provide the child with necessary subsistence, education, or other care necessary for physical or mental health or morals of the child or have neglected to pay for subsistence, education, or other care of the child when legal custody is lodged with others.

d. That the parents are unfit by reason of debauchery, intoxication, habitual use of narcotic drugs, repeated lewd and lascivious behavior, or other conduct found by the court likely to be detrimental to the physical or mental health or morals of the child.

e. That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination.

Plaintiffs claim that certain standards of § 232.41 are impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Specifically, they challenge the standards embodied in the phrases "refused to give the child necessary parental care and protection," § 232.41(2)(b), and "unfit [parents] by reason of . . . conduct . . . detrimental to the physical or mental health or morals of the child," § 232.-41(2)(d).[2] Plaintiff's post-trial brief at 26. Plaintiffs also assert that even if the statute were deemed to be sufficiently precise, it would violate their rights to Due Process of law by not requiring a sufficient threshold of harm as a prerequisite to permanent termination. Further, the Alsagers claim that procedural due process was denied them in that (1) adequate notice of the termination proceedings was not given them; (2) the standard of proof employed required a mere preponderance of the evidence rather than clear and convincing evidence; (3) hearsay evidence was admitted; and (4) *ex parte* communications between the judge and witnessing employees of the juvenile court may have occurred.

In order to properly determine the merits of plaintiff's constitutional challenges, it is first essential to examine the nature of the constitutional rights at stake. A plethora of opinions by the United States Supreme Court, addressed to the nature of constitutional interests implicated where various aspects of fam-

ily life are threatened, indicate that the Alsagers have a fundamental right to family integrity.

In *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Supreme Court upheld the right of parents to have their children taught the German language. The Court determined that the "liberty" guaranteed by the Fourteenth Amendment "without doubt, . . . denotes . . . the right of the individual . . . to marry, establish a home and bring up children." *Id.* at 399, 43 S.Ct. at 626. Similarly, in *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), the Court affirmed the enjoining of an Oregon statute which was deemed to interfere "with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Id.* at 534–35, 45 S.Ct. at 573. In *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), the Court noted that "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the State can neither supply nor hinder. . . . And it is the recognition of this that these decisions (*Meyer* and *Pierce*) have respected the private realm of family life which the state cannot enter." *Id.* at 166, 64 S.Ct. at 442.

This "liberty" right was similarly recognized in *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), where the Court emphasized the fundamental nature of the constitutionally protected right to marry and to procreate while invalidating a statute allowing the sterilization of habitual criminals. In *May v. Anderson,* 345 U.S. 528,

2. While this order is addressed only to the language expressly attacked by the plaintiffs, the Court is troubled by *other* language of the statute which is not specifically challenged. The introductory phrase of § 232.41 includes the word "may," suggesting the Iowa juvenile court has full discretion in making the termination decision once a subsection is found applicable. The phrase "or other conduct" found in subsection (d) *suggests* the Iowa juvenile court is free to add to the list of reasons justifying parental termination. Lastly, the word "likely" found in subsection (d) *suggests* that the court is free to determine what degree of tendency must be present to permit termination. These terms may or may not withstand a vagueness challenge; but their lack of specificity and their discretion-dispensing nature certainly support the Court's conclusions in this case.

73 S.Ct. 840, 97 L.Ed. 1221 (1953), the Court denied full faith and credit to an *ex parte* custody decree, noting that the Fourteenth Amendment's liberty included a parent's "immediate right to the care, custody, management and companionship of . . . minor children." *Id.* at 533, 73 S.Ct. at 843. More recently, in *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974), the Court invalidated mandatory leave provisions for pregnant school teachers because they unnecessarily interfered with the decision to raise a family. The Court observed that the "freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." *Id.,* 94 S.Ct. at 796, 39 L.Ed.2d at 60.

Other decisions, while premised on a "privacy" rather than a "liberty" rationale, have shown a similar solicitude for the family enclave. *See, e. g., Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). In *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court acknowledged the right to family integrity in declaring Illinois' dependency statute unconstitutional for depriving unmarried fathers of the care and custody of their natural children on the death of their mother. In the words of the Court, "the integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment." (citations omitted) *Id.* at 651, 92 S.Ct. at 1213.

Finally, in *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the United States Supreme Court addressed the pertinence of many of its above-mentioned decisions to the abortion context. The Court noted that while privacy is not explicitly mentioned in the Constitution, a right to a "guarantee of certain areas or zones" of privacy has been constitutionally recognized by the Court. In the words of the Court, the guarantee of personal privacy includes only those rights that are "implicit in the concept of ordered liberty," such as "activities relating to marriage . . . procreation . . . contraception . . . family relationships . . . and child rearing and education." *Id.* at 152, 93 S.Ct. at 726 (citations omitted). The Court further stated its belief that the privacy right is "founded in the Fourteenth Amendment's concept of personal liberty." *Id.* at 153, 93 S.Ct. at 727.

■ The inescapable conclusion arising from the foregoing authorities is that the Alsagers possess a fundamental "liberty" and "privacy" interest in maintaining the integrity of their family unit. *See generally,* Note, *Parental Consent Requirements and Privacy Rights of Minors: The Contraceptive Controversy,* 88 Harv.L.Rev. 1001, 1014–19 (1975). It is this fundamental right to family integrity, protected by the Due Process Clause of the Fourteenth Amendment, which is menaced by Iowa's parental termination statute.[3]

The Alsagers' constitutional arguments will now be considered with the foregoing premises regarding fundamental rights in mind. Plaintiffs challenge the statute as "void for vagueness" and

---

3. The Court is not presently concerned with the child's rights vis-á-vis the parents, even though it realizes that a child has a substantial interest in being free from parental neglect and abuse. The Court is only concerned with the parents' rights, in a termination context, vis-á-vis the state (See, § 232.1 for the rule of construction applicable to § 232.41 which refers to the "best interests of the state.") Plaintiffs' amended complaint does not challenge the Iowa neglect statutes; thus the Court's ruling today does not prevent the state from temporarily separating the child from its parents upon an adjudication of neglect or dependency. *See,* §§ 232.2(15); 232.33 of the Code of Iowa. The Court's ruling goes only to state action which *permanently* destroys the family unit, not to a temporary physical separation for the protection of the child. Further, the Court expresses no opinion as to the constitutionality of Iowa's summary removal procedures, § 232.7, for they are not before it. *Cf.* Consent Order entered in *Ives v. Jones,* Civil No. 75–0071–R (E.D.Va.1975).

as violative of their rights to substantive and procedural Due Process. While the Court believes the vagueness challenge to be dispositive, it will address the substantive and procedural Due Process issues as well, in order to promote a plenary disposition of this long-running controversy.

## VAGUENESS

■ Dating back at least to *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921), federal courts have been called upon to determine whether statutes embody such vague standards as to deny Due Process of Law. While vagueness attacks are made most often in a criminal context, the Supreme Court has held that "civil" statutes are susceptible to vagueness challenges as well. *A. B. Small Co. v. American Sugar Ref. Co.,* 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925). A vagueness attack stems from "the exaction of obedience to a rule or standard which [is] so vague and indefinite as really to be no rule or standard at all." *Id.* at 239, 45 S.Ct. at 297. In *Giaccio v. Pennsylvania,* 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), the Supreme Court reiterated:

> Both liberty and property are specifically protected by the Fourteenth Amendment against any state deprivation which does not meet the standards of due process, and this protection is not to be avoided by the simple label a state chooses to fasten upon its conduct or its statute. So here this state Act whether labeled "penal" or not must meet the challenge that it is unconstitutionally vague. *Id.* at 402, 86 S.Ct. at 520.

In *Giaccio* a jury acquitted the defendant on a misdemeanor indictment but assessed prosecution costs on him, as permitted by Pennsylvania statute, because he was found guilty of "some misconduct" other than that charged. Notwithstanding the state's assertion that the statute merely provided for the collection of costs of a "civil character," the Court found the statute unconstitutionally vague. Accordingly, the State of Iowa cannot avoid a vagueness challenge here by claiming the "civil character" of its parental termination statute. Indeed, the permanent destruction of the family unit—a severe infringement of a fundamental right—is a much more drastic consequence than the imposition of prosecutorial costs.[4]

■ The United States Supreme Court has identified several dangers inherent in vague laws:

> It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone'

---

4. Moreover, the consequences of parental termination adjudications are at least as severe as the consequences of convictions under vagrancy laws recently found to be unconstitu-tionally vague, e. g., a possible penalty of 75 days in jail or a $450.00 fine. *See Papachristou v. City of Jacksonville,* 405 U.S. 156 n. 1, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972).

. . . than if the boundaries of the forbidden areas were clearly marked." (Footnotes omitted) *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972).[5]

Vague statutes thus carry three dangers: the absence of fair warning, the impermissible delegation of discretion, and the undue inhibition of the legitimate exercise of a constitutional right. An analysis of these dangers in the context of the challenged standards of the Iowa parental termination statute leads the Court to conclude that the portions of the Iowa parental termination statute invoked against the Alsagers are unconstitutionally vague.

The initial danger present in a vague statute is the absence of fair warning. Citizens should be able to guide their conduct by the literal meaning of phrases expressed on the face of statutes. When the standard embodied in a statute is susceptible to multifarious meanings, a person may believe that his actions comply with the law, only to have the law used against him. The standards of "necessary parental care and protection," § 232.41(2)(b), and of "[parental] conduct . . . detrimental to the physical or mental health or morals of the child," § 232.41(2)(d), are susceptible to multifarious interpretations which prevent the ordinary person from knowing what is and is not prohibited. An examination of these phrases will not inform an ordinary person as to what conduct is required or must be avoided in order to prevent parental termination. For instance, a parent might follow a rigid scheme of "discipline-instilling" corporal punishment believing himself in full compliance with the law, only to learn of his folly at a termination proceeding.[6] The standards challenged here simply fail to give "the person of ordinary intelligence a reasonable opportunity to know what is prohibited."

The second danger present in a vague statute is the impermissible delegation of discretion from the state legislature to the state law enforcement body. The Iowa parental termination standards of "necessary parental care and protection," § 232.41(2)(b), and of "[parental] conduct . . . detrimental to the physical or mental health or morals of the child," § 232.41(2)(d), afford state officials with so much discretion in their interpretation and application that arbitrary and discriminatory parental terminations are inevitable. *Cf. Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948). Indeed, the Supreme Court has recently noted that "perhaps the most meaningful aspect of the vagueness doctrine is . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Smith v. Goguen,* 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974). Under Iowa's current scheme, state officials may subjectively determine, on an *ad hoc* basis, what parental conduct is "necessary" and what parental conduct is "detrimental." The termination of the parent-child relationship in any given case may thus turn upon which state officials are involved in the case, rather than upon explicit standards reflecting legislative intent. This danger is especially grave in the highly subjective con-

---

5. While the *Grayned* analysis was developed in a First Amendment context, its principles are equally applicable here. It is a fundamental right which is directly abrogated by the parental termination statute. Moreover, there is support for the Alsagers' contention that in addition to their "liberty" interests, their First Amendment freedom of association is threatened by the statute. *See Griswold v. Connecticut,* 381 U.S. 479, 482–83, 85 S.Ct. 1678, 1680–81, 14 L.Ed.2d 510, 513–14 (1965). Finally, even if the Court were to analyze the vagueness challenge herein solely "in the light of the facts of the case at hand," its outcome would be no different. *See United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); *United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 46 L.Ed.2d 228 (December 2, 1975).

6. The Court does not mean to imply that the termination statute proscribes this type of parental conduct. On the contrary, the Court is in no better position that the ordinary person to determine what is and is not prohibited by the Iowa law.

text of determining an approved mode of child-rearing. The Court finds these standards unconstitutionally vague in that they are permeated with the "dangers of arbitrary and discriminatory application."

The third danger present in a vague statute is the risk that the exercise of constitutional rights will be inhibited. The Iowa parental termination standards of "necessary parental care and protection," § 232.41(2)(b), and of "[parental] conduct . . . detrimental to the physical or mental health or morals of the child," § 232.41(2)(d), serve to inhibit parents in the exercise of their fundamental right to family integrity. Wary of what conduct is required and what conduct must be avoided to prevent termination, parents might fail to exercise their rights freely and fully. The risk that parents will be forced to "steer far wider of the unlawful zone" than is constitutionally necessary is not justified when the state is capable of enacting less ambiguous termination standards. The Court finds the aforementioned standards ᵛ unconstitutionally vague in that they deter parents from conduct which is constitutionally protected.

Although the Court has found the Iowa parental termination standards of "necessary parental care and protection," § 232.41(2)(b), and of "[parental] conduct . . . detrimental to the physical or mental health or morals of the child," § 232.41(2)(d), to be unconstitutionally vague, this determination in terms of the facial defects of the statute is not necessarily fatal; the Court must next determine whether this vagueness has been

cured, either generally, by the Iowa Supreme Court's decisions in other termination cases, or specifically, by the Iowa Supreme Court's opinion in this case. As the United States Supreme Court indicated in *Grayned, supra,* the defect of an enactment's vagueness can be ameliorated by a state court construction restricting the vague standards to constitutionally permissible bounds.[7] In fact, in *Grayned,* the Court concluded that an imprecise phrase in an anti-noise statute had been cured by the Illinois Supreme Court's delimiting construction of a similar phrase in another ordinance. 408 U.S. at 111, 92 S.Ct. 2294. *Grayned* thus suggests that the Iowa standards may be saved from their unconstitutional vagueness if the needed specificity has been supplied by the Iowa Supreme Court. Regrettably, the Iowa Supreme Court has not perfected a general or specific cure of these standards.[8]

The parental termination statute presently under attack was enacted in 1965 by the Sixty-first General Assembly of the State of Iowa. Since then a number of cases brought pursuant thereto have been reviewed de novo by the Iowa Supreme Court. In the great majority of decisions involving an application of the standards of "necessary parental care and protection," and of "[parental] conduct . . . detrimental to the physical or mental health or morals of the child," the Iowa court has simply made a determination as to the "substantiality of the evidence" to support a finding based on those standards.[9] The Iowa court has never attempted a restrictive construction of the termination standards themselves.[10] Moreover, the Iowa

7. *See also* Amsterdam, *The Void-for-Vagueness Doctrine in the Supreme Court,* 109 U.Pa. L.Rev. 66, 91–92 (1960).

8. Cf. *Smith v. Goguen,* 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974), where the Supreme Court noted that the Massachusetts flag contempt statute challenged therein for vagueness was "devoid of a narrowing state court interpretation at the relevant time in this case."

9. *See, e. g., In re Morrison,* 259 Iowa 301, 144 N.W.2d 97 (1966); *In re Yardley,* 260 Iowa 259, 149 N.W.2d 162 (1967); *In re Robbins,* 230 N.W.2d 489 (Iowa 1975); and *In re Kester,* 228 N.W.2d 107 (Iowa 1975).

10. In *Morrison, supra,* at 103, the Iowa court brushed aside a vagueness challenge to standards embodied in § 232.41(2)(b), (c) and (d). Apparently the court concluded that a vagueness attack was inapplicable based upon a penal-civil labeling rationale. The court stated that "these provisions are not invalid as criminal provisions." The court limited itself to "the judicial function of determining whether the facts disclose a violation of the law."

courts did not attempt to restrict the scope of the statute while terminating the Alsagers' parent-child relationships. Indeed, the Alsagers were subjected to all the vagueness dangers inherent in the indefinite standards of § 232.41(2)(b) and (d).

The Alsagers were not given fair warning of what was and was not prohibited by the Iowa law. The petition which instituted the termination proceeding against them merely alleged the conclusory language of the statute: "refused to give their children necessary parental care and protection" and "conduct detrimental to the physical or mental health or morals of their children." A reading of the petition and the termination statute would not have given the Alsagers notice of what they were doing wrong. They were not given a factual basis from which to predict how they should modify their past conduct, their "parenting," to avoid termination.

The May 22, 1970 Findings of Fact of the juvenile court, which did catalogue some of the familial deficiencies the state judge felt were most telling, merely incorporated that court's prior legal conclusion that "the allegation that the parents have substantially and continuously and repeatedly refused to give their children necessary care and protection and that they are unfit parents by reason of conduct detrimental to the

physical or mental health or morals of their children has been sustained by a preponderance of the evidence." Thus, the Alsagers were once again faced with establishing that their conduct fell outside the potentially boundless scope of § 232.41(2)(b) and (d).

On appeal, the Iowa Supreme Court failed to narrow the statute by specific references to the defective conduct of the Alsagers. Instead, without identifying the statutory basis for affirmance, the Court held that the "material facts" were "identical" to those of *In re McDonald,* 201 N.W.2d 447 (Iowa 1972).[11] This reliance on *McDonald,* which itself contained no narrowing criteria, serves to emphasize the dangers inherent in the vague standards involved. *McDonald* was not only based upon an entirely separate statutory ground than those alleged here, its material facts differed substantially from those of *Alsager.*

*McDonald* involved a parental termination based upon § 232.41(2)(e): "That following an adjudication of neglect or dependency, reasonable efforts under the direction of the court have failed to correct the conditions leading to the termination." However, § 232.41(2)(e) was not alleged as grounds for the Alsagers' termination.[12] The Iowa Supreme Court has itself held it to be a denial of due process to terminate parental rights on a ground not alleged in the petition to ter-

---

**11.** The opinion, in its entirety, reads as follows:

"PER CURIAM

"The natural parents appeal an order terminating their relation with five of their six children. We affirm.

"The facts are remarkably similar to those in *Re Interest of McDonald,* 201 N.W.2d 447 (Iowa 1972). The material facts can be said to be identical except to add the finding that the tragic deficiencies of both parents in this case appear to have resulted in more harm to the children. The greater harm unquestionably results from the longer period of time the children in this case lived with their parents. It would add nothing to detail the facts or explain the applicable rules of law in this opinion. We are precluded from attempting to achieve a justice as desired by the unfortunate parents by working a cruel injustice upon the

children. Neither can the children forestall growing up, in either suitable or unsuitable surroundings, while their parents exhaust the obviously vain hope their tragic circumstances will go away.

"The judgment of the trial court must be and is

"Affirmed." *State v. Alsager,* 201 N.W.2d 727 (Iowa 1972).

**12.** The record suggests that the juvenile court proceeded as if subsection (e) were in issue. The judge continued the matter of termination for a period of approximately eight months and two subsequent hearings, in hopes that the parents could improve to the extent that they could provide "minimal care." (The court did not indicate what parental conduct amounted to "minimal care.")

minate. *In re Robbins,* 230 N.W.2d 489 (Iowa 1975).

Moreover, *McDonald* involved a parent with a clinically tested I.Q. of 47. This fact was heavily relied on by the *McDonald* court in concluding that the parent was unable to care for her children. In contrast, the record here reveals no intelligence testing of the Alsagers. Nor is there any evidence which suggests the Alsagers lacked the mental capacity to perform parental functions. The Iowa court's conclusion claiming an identity of material fact between these two divergent cases is not justified by the record.

The Iowa Supreme Court's failure to cure the vagueness defects of § 232.41, either through a general narrowing construction in prior cases, or by a specific narrowing construction in the Alsagers' own case, leads this Court to conclude that the Alsagers were denied Due Process. The pertinent statutory language is overly vague, both on its face and as applied to the Alsagers. The Iowa court's decision indicates that the Alsagers were found only to have breached these vague standards.[13] In the absence of a showing that the plaintiffs violated a permissibly specific termination standard, their parental termination constitutes a denial of Due Process.

In sum, the Iowa parental termination standards of "necessary parental care and protection" and of "[parental] conduct . . . detrimental to the physical or mental health or morals of the child," are unconstitutionally vague, both on their face and as applied, in that (1) they do not, and did not here, give fair

warning of what parental conduct is proscribed, (2) they permit, and permitted here, arbitrary and discriminatory terminations, (3) they inhibit, and inhibited here, the exercise of the fundamental right to family integrity.[14] This Court is not indifferent to the difficulties confronting the State of Iowa when attempting to regulate parental conduct vis-à-vis the child. Nevertheless, Due Process requires the state to clearly identify and define the evil from which the child needs protection and to specify what parental conduct so contributes to that evil that the state is justified in terminating the parent-child relationship.

## SUBSTANTIVE DUE PROCESS

As an alternative to their vagueness challenge, plaintiffs contend that § 232.-41(2)(b) and (d) violate Due Process in that neither subsection requires a showing of a "high and substantial degree of harm to the children" as a prerequisite to termination, nor do they require the state to pursue "less drastic" alternatives prior to resorting to termination.

The United States Supreme Court has provided the following constitutional framework for analyzing statutes which encroach upon protected rights: "Where certain 'fundamental rights' are involved, the Court has held that regulation limiting these rights may be justified only by a 'compelling state interest,' and that legislative enactments must be narrowly drawn to express only the legitimate state interest at stake." (citations omitted). *Roe v. Wade,* 410 U.S.

---

**13.** The Alsagers have not argued that they, by their conduct, did not breach the legislative standards found by this Court to be unconstitutionally vague. Such a breach is a factual determination of the juvenile court, already reviewed and affirmed by the Iowa Supreme Court, and not in issue here.

**14.** While the Alsagers' vagueness challenge was directed to the statutory language applied against them, they also have implicated § 232.-41(2)(c) as possessing the same constitutional defects. That section allows termination where the parents, although "financially able

. . . have substantially and continuously neglected to provide the child with necessary subsistence, education, or other care necessary for physical or mental health or morals of the child or have neglected to pay for subsistence, education, or other care of the child when legal custody is lodged with others." To the extent certain terms of subsection (c) are identical to those of subsections (b) and (d), the Court deems that similar vagueness problems might exist. The gist of (c) goes to matters not presently before this Court, however, and no opinion is expressed thereon.

113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973). Accordingly, this Court must determine whether § 232.41(2)(b) and (d) further a "compelling" state interest as justification for parent terminations, and whether these subsections are narrowly drawn so as to express only that compelling interest.

It cannot seriously be disputed that the state seeks to further a legitimate state interest when it sets out to protect the welfare of its citizens of tender age. Indeed, as the Supreme Court recognized in *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the state has the "right" and the "duty" to protect minor children. *Id.* at 649, 92 S.Ct. 1208. *See also Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

█ The state's interest in protecting children is not absolute, however. It must be balanced against the parents' countervailing interest in being able to raise their children in an environment free from government interference. Moreover, in determining the "compelling" nature of the state's child protection interests when a parental termination is undertaken, an understanding of the mechanics of Iowa law is essential. Even in a case of clear child abuse, Iowa law has vitiated the need for prompt termination action through its child neglect statute, §§ 232.2(15), 232.33, Iowa Code. That law sanctions the immediate, albeit temporary, removal of a child from the parents' home in cases of maltreatment. The Court's ruling today as to the adequacy of Iowa's termination standards is in no way intended to restrict the state's ability to take swift action when necessary to prevent imminent harm or suffering to a child. Once a child has been removed from the risk of harm, however, as well as in cases where the risks of harm are insufficient to justify temporary separation, the state's child protection interests are less

compelling. Accordingly, the Court deems that termination proceedings should be distinguished from immediate removal proceedings for purposes of substantive due process analysis. The state's interest in protecting a child from future harm at the hands of his or her parents is clearly less compelling in a situation where the state has already obtained temporary protective custody over the child than in those cases where the supposedly threatened child remains in the parents' home.

█ It is the Court's conclusion that the evidence urged in this case was wholly insufficient to constitute a "compelling state interest" in terminating the protected parent-child relationship of this already separated family.[15] The evidence reveals that the Alsagers sometimes permitted their children to leave the house in cold weather without winter clothing on, "allowed them" to play in traffic, to annoy neighbors, to eat mush for supper, to live in a house containing dirty dishes and laundry, and to sometimes arrive late at school.

At the time of the termination, Mr. Alsager was a working man who had never been on public welfare rolls. He and his wife lived together, and shared an interest in keeping their family unit intact. The Court cites this evidence not to contradict the findings of the juvenile court, but simply to describe the general nature of the Alsagers' family situation in 1969. The Court accepts the juvenile court's factual findings, but agrees with Dr. Robert Kugel and Dr. Kenneth Berry, plaintiffs' trial experts, who testified that even if all of the evidence harmful to the Alsagers is assumed to be true, their home situation did not justify permanent termination. The probative termination standard to which the Alsagers were subjected in 1969 and 1970 was simply not high enough to ensure that their fundamental parental rights would not be violated. Stated differently, the

---

15. The Alsager children had been out of their home some seven to eight months prior to

Judge Tidrick's final termination order in May of 1970.

Alsager family unit was severed on the basis of evidence which was insufficient to give the state a "child-protection interest" compelling enough to require termination.[16]

■ As plaintiffs concede, the statute's vagueness is a partial cause of its amenability to broad application. Nonetheless, even in the context of a precise and specific enactment, Due Process requires a certain threshold of harm to the child to justify termination. In this regard, the Court accepts plaintiffs' argument that to sustain its compelling interest burden, the state must show that the consequences, in harm to the children, of allowing the parent-child relationship to continue are more severe than the consequences of termination. This burden was clearly not met in the instant case.[17]

The evidence shows the Alsagers to have been affectionate parents, of below average but by no means inadequate intelligence, who lost their children through application of the loose standards, if any, contained within § 232.-41(2)(b) and (d). No actual or imminent harm to the children was shown to exist as a prerequisite to termination. This Court has heard much evidence pertaining to the harmful effects which improvident physical separations and final terminations can visit upon young children. If anything has been made clear throughout these proceedings, it is that the area of predicting what will be in the best future interests of the child is a delicate one. Through the benefit of hindsight, this Court can today see no apparent benefit to the 1970 termination. As indicated by plaintiffs' counsel at trial, during the interim from 1969 to 1974, Alsager children John, Charles, Michael and Albert between them experienced some 15 separate foster home placements, and eight juvenile home placements. The uncertainty of post-termination life is further depicted by the fact that when the case was first argued before this Court in March of 1974, plaintiffs' experts recommended that even if the termination proceedings were ruled unconstitutional, two of the children should be permanently placed in their present foster homes. *See* 384 F.Supp. at 651. Some months later, by the time this case was before the Circuit Court of Appeals, the situation had changed in that the two "well-adjusted" boys had apparently rejected their foster homes and were being considered for probationary placements with their parents. 518 F.2d at 1166.

■ Termination has thus failed to provide the Alsager children with either

---

**16.** The Court expresses no opinion on whether the evidence was sufficient to constitute a compelling state interest justifying temporary separation. That issue is not before the Court.

**17.** *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), where the Supreme Court addressed the fundamental right of parents to direct the religious upbringing of their children vis-a-vis the state's interest in requiring compulsory education to age 16 in a state approved public or private school. The Court examined the evidence to determine whether the state sustained a compelling state interest sufficient to justify the educational requirements imposed, and found the evidence to be insufficient. The Court stated, "To be sure, the power of the parent, even when linked to a free exercise claim, may be subject to limitations under *Prince [v. Massachusetts, supra]* if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.

But in this case, the Amish have introduced persuasive evidence undermining the arguments the State has advanced to support its claims in terms of the welfare of the child and society as a whole. The record strongly indicates that accommodating the religious objections of the Amish by foregoing one, or at most two, additional years of compulsory education will not impair the physical or mental health of the child, or result in an inability to be self-supporting or to discharge the duties and responsibilities of citizenship, or in any other way materially detract from the welfare of society.

"In the face of our consistent emphasis on the central values underlying the Religious Clauses in our constitutional scheme of government, we cannot accept a *parens patriae* claim of such all-encompassing scope and with such sweeping potential for broad and unforeseeable application as that urged by the State." *Id.* at 233–34, 92 S.Ct. at 1542.

stable or improved lives. Based on their parents' capabilities, the Court cannot say that separation has benefited the children in any discernible way. In the eyes of plaintiffs' experts, they have been harmed. One lesson emerges clearly from this sad testament. Termination is a drastic, final step which, when improvidently employed, can be fraught with danger. Accordingly, to preserve the best interests of both parents and children, the Court deems that terminations must only occur where more harm is likely to befall the child by staying with his parents than by being permanently separated from them. In such a circumstance, the state does have a compelling interest in curtailing the parents' familial rights. The facts of this case do not rise to that level of harm, however. Accordingly, because the Alsagers' legal relationships to their children were severed in the absence of a compelling state interest, the plaintiffs Due Process rights were violated. Furthermore, § 232.41(b) and (d), to the extent they allow such terminations, clearly "sweep too broadly"[18] by encompassing family situations where no compelling interest exists for termination. Thus, the subsections deny Due Process both on their face and as they were applied in the instant case.[19]

## PROCEDURAL DUE PROCESS

Plaintiffs claim that they were denied procedural Due Process in that (1) the notice given them regarding the termination proceeding was inadequate, (2) the standard of proof employed by the juvenile court required a mere preponderance of the evidence rather than clear and convincing evidence, (3) hearsay evidence was admitted, and (4) ex parte communications between the judge and witnessing employees of the juvenile court may have occurred.[20] The Court finds merit in plaintiffs' claims that the notice given them was inadequate and that the standard of proof employed was insufficient. As to the latter two claims, the hearsay evidence admitted was considered only to the extent of its probative value. See, Code of Iowa § 232.31. The Court is confident that the juvenile court judge was able to discern probative value absent the safeguards provided by the hearsay rule. Second, the record does not disclose that actual ex parte communications occurred. The plaintiffs' assertion that they "may" have occurred is not sufficient to warrant a determination on that issue. Accordingly, the Court finds these two contentions to be without merit.

The plaintiffs argue that the notice given them was insufficient to satisfy Due Process. The Court agrees. The Fourteenth Amendment requires notice in parental termination proceedings to contain both the alleged factual basis for the proposed termination and a statement of the legal standard authorizing termination.

In *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Supreme Court outlined the type of notice which due process requires:

Notice, to comply with due process requirements, must be given sufficiently

---

**18.** *Roe v. Wade*, 410 U.S. 113, 164, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**19.** Since the alternatives of providing outside community services to the Alsagers may or may not have existed at the time their parental relationship was terminated, the Court is unable to determine the issue raised by the plaintiffs in regard to requiring the state to pursue the "least drastic" alternative to parental termination. While the Court recognizes that the means employed by the state to achieve its compelling state interest must be narrowly tailored to achieve only that interest, *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Cleveland Board of Education v. LaFleur, supra; Lynch v. Baxley*, 386 F.Supp. 378, 392 (M.D.Ala.1974), it is wary of saddling the state with service-oriented responsibilities which its limited resources may not allow. Moreover, the recent Iowa Supreme Court decision of *In re Rice*, filed December 17, 1975, reveals a present awareness in the state courts of the availability and utility of less drastic alternatives in the parent-child context.

**20.** As previously noted, the Court addresses these issues to achieve a plenary disposition of this case. It deems the prior legal conclusions herein to be dispositive of the Alsagers' suit.

in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must "set forth the alleged misconduct with particularity" . . . . [P]arents [must] be notified, in writing, of the specific charge or factual allegations . . . . .

Although *Gault* involved a juvenile delinquency, the Court deems its exposition of Due Process "notice" to be equally applicable here.

The only written notice the Alsagers received of the grounds for termination was a copy of the petition filed in juvenile court. That petition merely paraphrased the vague and conclusory language of the parental termination statute, § 232.41(2)(b) and (d):

> [T]he best interests of the children . . . require that the parent-child relationships . . . be terminated by the Court because said parents have substantially and continuously and repeatedly refused to give their children necessary parental care and protection and because said parents are unfit parents by reason of conduct detrimental to the physical or mental health or morals of their children. (Juvenile Court transcript at 5–6).

The state admits that its petitions for parental termination do not specify allegations of abuse, mistreatment or parental failings. However, the state argues that the "specific charge" language from *Gault* means only that the parents be informed as to what section or subsection of the Code of Iowa will be used to justify termination.

in *Lynch v. Baxley*, 386 F.Supp. 378 (M.D.Ala.1974), a three-judge court applied the *Gault* notice requirements to civil commitment proceedings. There the court concluded that

> such notice should include the date, time and place of the hearing; a clear statement of the purpose of the proceedings and the possible consequences to the subject thereof; the alleged factual basis for the proposed commitment; and a statement of the legal

standard upon which commitment is authorized. *Id.* at 388.

Given the nature of the parental rights at stake, and the state's obvious interest in avoiding improvident terminations, the Court is unable to identify any reason why notice in parental termination proceedings should not follow *Baxley* and contain both the alleged factual basis for the proposed termination and a statement of the legal standard authorizing termination. *Cf. Wolff v. McDonnell*, 418 U.S. 539, 563–74, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiffs argue that they were denied Due Process in that § 232.46 of the Code of Iowa authorizes, and the state court employed, a preponderance of the evidence standard of proof.

In *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), the Supreme Court looked to the nature of the right at stake in determining what standard of proof should be employed in a juvenile delinquency proceeding. In *Winship*, a child's liberty was at stake, so proof beyond a reasonable doubt was necessary. Similarly, this Court must look to the nature of the right involved in order to determine what standard of proof is required. *Baxley, supra*, held that involuntary civil commitment required at least a standard of clear and convincing evidence. Certainly, the fundamental right to family integrity deserves an equal standard. Moreover, § 232.31 of the Code of Iowa requires clear and convincing evidence in neglect, dependency and delinquency adjudications. The state would not be unduly burdened to treat parental termination adjudications in a similar fashion.

As a final matter, the Court notes that plaintiffs' amended complaint seeks $50,000 in damages for defendants' "willful violation of plaintiffs' constitutional rights." Plaintiffs do not argue that the defendants' actions were outside the scope of the pertinent Iowa statutes. Indeed, they concede that their parenting can be viewed as falling within the statutory language of § 232.41(2)(b) and

(d). Their dissatisfaction goes to the potentially boundless scope of those provisions. As the Court noted in its prior Order, "the statute was followed in the state proceedings, and seemingly in good faith." 384 F.Supp. at 651. The Court reaffirms that conclusion here. The evidence is insufficient to justify an award of monetary damages from any of the defendants.

## CONCLUSION

To conclude, the Court today holds that three major constitutional violations occurred in the termination proceedings utilized in 1969 and 1970 to sever the plaintiffs' legal ties with five of their six children. First, the pertinent language of § 232.41(2)(b) and (d) is simply too vague to withstand Fourteenth Amendment analysis. More importantly, however, that language was applied with no discernible narrowing of its broad scope. This Court is well aware of the difficulties inherent in drafting statutes in general, and especially statutes which deal with delicate areas such as familial rights. The Court does not imply by its ruling today the perfect legislative precision must always be obtained. It is the process of a statute's application which is crucial. Subsections (b) and (d), statutes undeniably broad in their scope, were imposed against the plaintiffs with no discernible narrowing of that breadth. Thus, their vagueness was not ameliorated, and plaintiffs' constitutional rights were transgressed. Second, plaintiffs' rights to substantive due process were violated because no compelling state interest was shown for the 1970 termination. The 1969–1970 familial situation of the Alsagers was simply not deficient enough to justify its end. These parents were trying to do the right thing. Under the facts of this case, they should have been allowed to continue to do so. Finally, the Court deems that the notice given the parents and the standard of proof employed in the termination proceedings failed to satisfy due process.

The plaintiffs today receive what they ask for—a declaration of the unconstitutionality of their termination proceedings. In so ruling, the Court is not operating under the delusion that the Alsager family's problems are now ended. The delineation of constitutional protections as it relates to the state, the parent, and the child should and must be approached with extreme caution. Harmony under trying family circumstances requires infinite patience, understanding, and sacrifice. This adjudication of the Alsager parents' constitutional rights regarding termination proceedings touches only one point of the triangle of rights. To state that it will put to rest all the family's difficulties and be a final solution to the problems which began in 1968 and 1969 would be the utmost in judicial conceit.

Accordingly, it is hereby declared that § 232.41(2)(b) and (d), on their face and more particularly as applied to the Alsagers, are unconstitutionally vague;

It is further declared that the Alsagers were denied substantial due process in the 1969 and 1970 termination proceedings, in that no compelling state interest justifying termination was shown;

It is further declared that the notice received by the Alsagers was defective, as was the standard of proof employed against them;

It is further ordered that the plaintiffs' claim for monetary damages, and their procedural due process challenges to hearsay evidence and improper communications to the juvenile court judge are dismissed.

It is further ordered that the above shall constitute the Findings of Fact, Conclusions of Law, and Order for Judgment in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

It is so ordered.