**In the Interest of C. AND K., Children.**

**No. 67721.**

Supreme Court of Iowa.

July 21, 1982.

Thomas J. Miller, Atty. Gen., John G. Black, Sp. Asst. Atty. Gen., and Brent D. Hege, Asst. Atty. Gen., for appellant State of Iowa.

Jerry R. Foxhoven of Critelli & Foxhoven, PC, Des Moines, for appellee mother.

Victoria L. Meade of Marks, Marks & Marks, Urbandale, guardian ad litem for the children.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, HARRIS, and LARSON, JJ.

HARRIS, Justice.

This child termination case was brought pursuant to section 232.116(5), The Code 1981. As often happens, the interests of the childrens' mother, herself a child victim of poverty and neglect, are pitted against the needs of her two children. The trial court held that the State failed in its burden to show by clear and convincing evidence that the children could not be returned to their mother's custody. § 232.-116(5)(c), The Code. On our de novo review we conclude the State carried its burden. We think irreparable harm would certainly befall the children if they were entrusted to their mother. This conclusion requires us to consider and reject the mother's constitutional challenges to the termination proceeding. We reverse the trial court.

We should note that there is no appeal from that part of the trial court order which terminated the parent-child relationship between the children and their respective fathers. In each case the father had never had contact with the child and was rightly adjudged to have abandoned them. Only the relationship with the mother is involved in this appeal.

Tragedy and poverty generally go hand in hand in factual recitations in parent-child termination proceedings. Even so the facts here are exceptionally pathetic. The mother expresses a strong desire, which we accept as sincere, to regain custody of her children. Her shortcomings lie not with her wishes but in her indolence and woeful lack of inherent capacity. Though she wishes she could, she simply cannot function as a rational adult and mother. To whatever extent her surroundings have been made livable, even sanitary, all credit must go to the considerable efforts of the department of social services in Polk County. These efforts, attempting to mold the appellee into a functioning adult and mother, have been herculean, long suffering, and fruitless.

The two children, Christopher, born August 10, 1978, and Katherine, born November 24, 1979, were adjudged to be in need of assistance in an order entered September 26, 1980. The basis of the adjudication for Katherine was section 232.2(5)(b), The Code. For Christopher it was sections 232.2(5)(b) and (g), The Code. In transferring custody of children to the department of social services the trial court detailed the conditions which necessitated their removal:

Allowing the children to live in a residence where chickens and pigs are raised, where it is extremely dirty and filthy with cockroaches, where the children have inadequate meals prepared, where the natural mother fails to provide adequate food due to spending money on other items, where animal feces is commonly found on the floors and in the vicinity where the children play, where the children are allowed to retrieve candy from animal feces and continue eating the candy, where a chicken was trying to pick the scab off the head of one of the children while the child was sitting on the floor, where marijuana is found in the house together with a hash pipe, where the children sleep on mattresses that are

wet and soaked with urine, living in a home where there are no diapers, bottle brush, toilet paper, wash rags and towels, sheets, soap, shampoo, table, highchair, curtains, pillows, mattress cover, where one of the children deficated in the tub while the child was receiving a bath and the tub was not cleaned for a week, where the mother took a wash cloth and wiped feces from the leg of one of the children and then immediately wiped his face with the same wash cloth, where the children are found with impetigo, nutritionally deficient with numerous insect bites and smelling dirty with a urine odor and diaper rash, where rotten meat has been found in the refrigerator, where the children have been put in the bath tub with water and the mother has left the room, where one of the children was admitted to the hospital for failure to thrive with maternal deprivation.

The described conditions were those in the home of Cheryl's mother, with whom Cheryl resided at the time. In these proceedings, and on this appeal, it is strenuously contended in behalf of Cheryl that these conditions no longer exist for her, now that she lives apart from her mother. It is pointed out that Cheryl's shortcomings differ vastly from the shortcomings of her mother and that the contrast must be credited as improvement. Resolution of the requirements of the statute is however not that simple. Cheryl's tragic background is only background. It does not mark a starting point from which any improvement would call for a safe return of her children. Children's safety cannot depend on so fragile a thread. It will not satisfy the statute to move merely from degradation to an environment still dangerously unsafe for children.

I. As an essential element to establish ground for termination the State must show "there is clear and convincing evidence that the child cannot be returned to the custody of his or her parents . . . ." § 232.116(5)(c), The Code. We have long adhered to the clear and convincing evidence standard. *In Interest of Dameron,* 306 N.W.2d 743, 744 (Iowa 1981). The clear and convincing evidence standard is a requirement under the United States Constitution. *Santosky v. Kramer,* —— U.S. ——, ——, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599 (1982).

Doctor Herbert L. Notch, a clinical psychologist, conducted extensive tests and evaluations of Cheryl. Understandably, he found Cheryl to be notably depressed. She does not look on life's situations quickly enough to deal with them effectively. She has a lack of insight and poor impulse control which prevent her from dealing realistically with social limits. Significantly, she has a low self-concept and body concept. Testifying of Cheryl's histrionic disorder the doctor said:

A. It has to do with over-reaction to normal situations where the limited insight and inability to assess the situation in ordinary terms of understanding would suggest that the patient might react with an excess of anxiety and consequently behavioral outcomes would be changed.

Q. Going back for a second to the borderline functioning findings, Dr. Notch, are you able to determine from your testing about what level this individual was functioning intellectually? A. That's difficult to assess, because the standard deviation on any of the intellectual testing done is ten points either way, either side of a score. So that on a given test, you couldn't really use a specific score and say that it is accurate within more than about ten points either way.

Q. From all of your tests taken together, would you be able to make a finding or a statement regarding at what level you would believe this person to be functioning? A. Borderline intellectual functioning.

Q. But you could not assign, like, an average level to that; is that correct? A. No. I would expect generally with borderline functioning depending on the person's environment assets and stimulation from early childhood and gross experience, that would change.

Q. Is intellectual—borderline intellectual functioning itself likely to change much during a person's lifetime? A. That's generally an irreversible concept.

Q. Are the conditions which result from that, such as I believe you say problems with abstracting and poor impulse control, are they also unlikely to change? A. They can change with training and behavior management, but they would not change from an impetus from within the person.

Q. Are you saying there would have to be some outside control? A. Generally speaking, yes.

Q. Would that have to be ongoing probably? A. At least in a monitoring sense.

A parade of witnesses validated Dr. Notch's dismal observations. Cheryl could not be driven, even by way of two written contracts with social workers, to bathe regularly. Her personal hygiene was deplorable. She often slept in her clothes and was most indiscriminate about whom she slept with. We choose not to repeat in this published opinion the specific details of this unfortunate young woman's lack of hygiene. It seems unfair to do so. It should be sufficient to say that among all the alarming facts in this record we find her uncleanliness especially depressing.

Cheryl shared a number of apartments with various persons, more often male than female. During a five-month period following the time the children were removed from her she seems to have moved no less than six times. During this time, as will later be explained, Cheryl was furnished a myriad of welfare services, including those of a housekeeper. The housekeeper was to help clean the various apartments and instruct and train Cheryl to do so. This proved an impossible burden. Except for the efforts of the housekeeper, one of Cheryl's male companions, and those who may have cleaned the various apartments immediately before Cheryl moved into them, Cheryl's surroundings seem always to have been uniformly filthy. Upturned ashtrays, cans, and various debris were often found on the floor, dirty dishes uniformly were found in the sink, spoiled food was on top of the counter of the kitchen, and dirty laundry in the clothing basket. In addition to whatever other deficiencies from which Cheryl suffers, an overriding one seems to be that of marked indolence. Notwithstanding continued efforts by the welfare officials and helpers, and although Cheryl must have somehow realized the stakes were very high, it was impossible to persuade Cheryl to get out of bed in the morning, to bathe, and to take out the garbage.

At the beginning of the period following the removal of the children those assigned to the social services department began an intense program intended for Cheryl's habilitation. Many programs and services were offered her. At the beginning a number of services had already been provided for Cheryl for a period of almost two years by several agencies. For example Cheryl's homemaker, whose testimony has already been reflected in our findings, was already working with Cheryl. She also had a "protective payee," a person from the department of social services who oversaw Cheryl's financial aid, making sure the money was disseminated correctly. Cheryl has also been working off and on with the public health nurse. She had the services of what is called a family counselor, whose basic job it was to help coordinate the services already involved. The family counselor would meet with Cheryl to help her work through any difficulty.

Cheryl also had a case manager from the department whose function was to oversee all services provided throughout the community and to make sure that community services she needed were being provided. The department initiated the help of a volunteer from juvenile court who was a person willing to help monitor Cheryl's progress in the home. There was obvious concern for Cheryl's care of children and a fear that it was inadequate and that the children were not safe. The volunteer was employed to make frequent visits in Cheryl's residence to spend time with her, to talk with her, to help her play with the

children, and to be of what service she could. The service of a day-care home was provided for Christopher at least after the birth of his little sister to help ease the burden on Cheryl.

This myriad of services was provided and continued up until the birth of Katherine, the second child. All services were intended to give Cheryl guidance, teach her such specific basic things as feeding the children, and the importance of proper diet, diaper changing, and how to bathe a child. The goal was to help her get her life together, to teach her how to be a housekeeper, how to nurture the children, and to be receptive to them.

Later services, offered during the year following the children's removal, included an urban campus where Cheryl could go to school. She had the advantage of a child guidance center and was offered the advantage of parent's growth pattern classes. There were a total of about seven or eight different agencies that worked with Cheryl during the period prior to and following the children's removal.

In order that Cheryl might have some understanding of the improvement to be expected from her the department entered into successive contracts which listed fundamental duties she was supposed to perform in the home. The first was entered near the time the children were removed. When no significant change had resulted from the department's efforts a second was entered, January of 1981. Both contracts called for such fundamentals as a demand that Cheryl keep the floors clean, and to do those basic, specific things which simple sanitation would demand. But there was no improvement in sanitation. Cheryl's homemaker instructed her to keep food in a sanitary condition. Leftovers, she was told, should be kept covered. But this was not done, even in an apartment so full of cockroaches that they would crawl into food inside the refrigerator. The homemaker testified that at times food was rewarmed with cockroaches in it.

It was in the hope of drawing more particular attention to these deficiencies that the second contract was entered. There was increasing concern with Cheryl's lack of personal hygiene and that she was never out of bed before the homemaker came and usually had the clothes on that she slept in. Cheryl would have nothing done before the homemaker came. In the hope it would help develop Cheryl's sense of responsibility the second contract provided that she was to have some specified things completed before the homemaker came. She was supposed to have a bath and have clean clothes on, to have the bed made, and the garbage of the night before removed. Cheryl continued to be personally unclean with a strong body odor as late as ten o'clock in the morning.

Even under the second contract, Cheryl became no more responsible. There was some hope that she felt somewhat better about herself but no indication that she was in a position to help cope with life more effectively.

Cheryl relates more to men than with women and a number of her apartment moves seemed to have been with the purpose of being cared for by unattached males. The department personnel were exasperated because, upon these moves, Cheryl would not inform them and contact with her was continually lost. Quite suddenly Cheryl married a young man to whom she remained married at the time of the termination hearing. This marriage was unexpected by any of the personnel because Cheryl had not mentioned the groom in any prior conversations about her apartment companions. Cheryl's husband did not testify at the proceeding. Cheryl stated he is in the navy and supports her wish to regain custody of the children. However we have no reliable knowledge about him, his abilities, or interest in the children, or lack of it.

Cheryl's situation and surroundings pose a danger to the children. Notwithstanding all the help she had been receiving there was a very real threat to them. Katherine was ten months old at the time and was in deplorable condition, unhealthy as well as unclean. An examining doctor felt the child was maternally deprived. Christo-

pher's development was dangerously delayed. The physical condition reflected their surroundings.

The improvement of the children under foster care has been dramatic. They have grown, gained, and now appear to be normal, happy children.

Cheryl testified in support of her desire for return of the children. She said her serviceman husband was in Florida where she would move and assured the trial court that she would contact someone for homemaker services in Florida. When asked why she responded: "A. Why? to help, to come to see if—come and see how I am doing. Q. So you don't feel capable of doing it on your own? A. Yeah. Q. So why would you contact a homemaker service? A. Because everybody needs help."

We in no way doubt Cheryl's sincerity in wishing to be a mother for her children. She exercised every opportunity available to her to visit with them. She complains that the fact that they were in foster care denied her a chance to develop parenting skills. But the plain truth is that Cheryl lacks the innate ability and cannot acquire the capacity to function as a mother. In every way the children do and perform better without than with her. The obvious danger and damage to the children upon a return appears clearly and convincingly; in fact it appears conclusively on this record.

■ If it can be imagined or even hoped that Cheryl might one day develop enough rudimentary skills to function adequately there is no way this could be done in time for these children. The precious and crucially important days of childhood move inexorably. Nature allows no continuances. We have said many times that children cannot wait to grow up. Tragic and pathetic as these circumstances are for Cheryl, and harsh though the result surely must seem to her, the disaster that would result to the children upon return is too obvious for us to ignore. The State has more than borne its burden of proof.

II. Because its findings of fact were opposite those we reached upon our de novo review the trial court did not address Cheryl's constitutional challenge to the termination statute. It is of course necessary for us to do so. Relying largely on *Alsager v. District Court of Polk Cty., Iowa*, 406 F.Supp. 10, 16 (S.D.Iowa 1975), *affirmed in part*, 545 F.2d 1137 (8th Cir. 1976), Cheryl argues that the termination statute is unconstitutional on its face and as applied. We need consider only Cheryl's challenge that the statute is unconstitutional as applied to her. If it is constitutional as to her she has no standing to complain that it might be unconstitutional to others. *City of Des Moines v. Lavigne*, 257 N.W.2d 485, 486 (Iowa 1977). It is axiomatic also that if the statute is constitutional as to Cheryl it cannot be facially unconstitutional. This is because to be facially unconstitutional it must be found that the statute cannot be constitutionally applied to any factual situation, including Cheryl's. Antieau, Modern Constitutional Law, § 15:36, p. 698.

■ Cheryl contends our termination statute violated due process for its failure to require a showing of harms. We deny that it is subject to this infirmity. We interpret it to require the sort of showing Cheryl complains it lacks. We have said economic and cultural advantages elsewhere do not tip the balance from the home of natural parents in favor of someone else. "Courts are not free to take children from parents simply by deciding another home offers more advantages. [Authority.]." *Matter of Burney*, 259 N.W.2d 322, 324 (Iowa 1977). *See also Matter of Guardianship of Sams*, 256 N.W.2d 570, 573 (Iowa 1977).

■ We have previously noted that sections 232.116(5), 236.102(6), and 232.2(5) do in fact require a showing by clear and convincing evidence. We acknowledge that this is a mandate of the due process clause of the Fourteenth Amendment before the termination of parental rights. *In Interest of Chad*, 318 N.W.2d 213, 219 (Iowa 1982). Insofar as Cheryl argues that these statutes are unconstitutional as applied for failure of this burden, the argument fails upon our finding that the State did meet that burden. Cheryl also contends that section 232.-116(6) is unconstitutional on its face be-

cause, she says, it unconstitutionally reverses the burden of proof. We deny that the statute does such a thing; it does not relieve the State of any burden. The burden of the State remained, and was borne throughout the proceedings, as required by the statute.

■ Cheryl argues that termination would be unconstitutional because the State relied on conditions in the termination proceeding which were different from those relied on by the trial court in the prior CHINA adjudication. The contention is unsound. Although Cheryl can point to the fact that livestock existed in her mother's home, and did not in her own or her boyfriend's apartments, it was not essentially the presence of livestock which brought about the CHINA order. It was the overall lack of sanitation, hygiene, cleanliness, and parental adequacy that pervaded this pathetically unfortunate mother throughout the three years of fruitless efforts by the department of social services.

Cheryl's challenges to the constitutionality of the termination statute are without merit.

The judgment of the trial court is reversed and the case is remanded for an order terminating the relationship between Cheryl and the children.

REVERSED AND REMANDED.