In the Interest of D.J.R., A child,

D.R., Natural Father, Appellant,

M.R., Natural Mother, Appellant.

No. 89–503.

Supreme Court of Iowa.

April 18, 1990.

Rehearing Denied May 23, 1990.

Steven M. Porto, West Des Moines, for appellant D.R.

William A. Price, Des Moines, for appellant M.R.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Kathrine S. Miller–Todd, Asst. Atty. Gen., James A. Smith, County Atty., and Karen A. Romano, Asst. County Atty., for appellee State of Iowa.

Marlene Cebuhar of the Youth Law Center, Des Moines, attorney and guardian ad litem for the child, D.J.R.

Considered by McGIVERIN, C.J., and LARSON, CARTER, LAVORATO and NEUMAN, JJ.

McGIVERIN, Chief Justice.

In November 1988, the juvenile court terminated the parental rights of D.R. and M.R. with respect to their daughter, D.J.R. Both D.R. (the father) and M.R. (the mother) appealed.[1] The case was transferred to our court of appeals. That court affirmed the judgment of the juvenile court. D.R. and the State applied for further review, which we granted.[2]

■ Our review is de novo. *In the Interest of Dameron*, 306 N.W.2d 743, 745 (Iowa 1981). We review both the facts and the law and adjudicate the parties' rights anew on the propositions properly presented for review. *Id.* The best interest of the child is the overarching consideration in a case of this nature. *Id.*

Although our reasoning in this case differs from that of the court of appeals, we agree with the court of appeals conclusion that the juvenile court properly terminated the parental rights of D.R. and M.R. We affirm the decision of the court of appeals and the judgment of the juvenile court.

I. *Background facts and proceedings.* D.J.R. was ten years old when she was removed from her parents' custody in March 1985. The initial impetus for the removal was D.J.R.'s report to a schoolteacher that D.R. had physically and sexu-

---

1. Although M.R. filed notice of appeal and joined in D.R.'s brief, she now agrees with the State and D.J.R.'s guardian ad litem that her parental rights with respect to D.J.R., as well as those of D.R., should be terminated. M.R., however, purports to be "fearful" that the interests of D.J.R. would not be adequately protected if D.R.'s parental rights are reinstated. M.R. seeks reinstatement of her parental rights "if and only if" D.R.'s parental rights are reinstated. M.R. did not seek further review of the court of appeals decision in this case.

2. D.R. seeks reinstatement of his parental rights. The State seeks to uphold the termination, but applied for further review because the court of appeals relied on statutory language that was declared unconstitutionally vague in *In the Interest of Wall*, 295 N.W.2d 455 (Iowa 1980). The State concedes that the reasoning of the court of appeals cannot stand, but argues that the juvenile court properly terminated the parental rights of D.J.R.'s parents on other grounds that are constitutionally firm. D.J.R.'s guardian ad litem joins in the State's brief.

ally abused her.[3] D.J.R. was placed in the custody of the Polk County Department of Human Services (DHS) pending resolution of the child in need of assistance proceeding concerning her.

While in the custody of the DHS, D.J.R. underwent psychological evaluation by Dr. John C. Meidlinger. Dr. Meidlinger's preliminary report noted D.J.R.'s tendency to "confabulate," that is, make up answers to fill gaps in her memory or understanding. The report also noted her unusual lack of attachment to her parents and her adamant desire not to be returned to her parents from foster care. Dr. Meidlinger's final report, issued after five sessions with D.J.R. which took place in March and April 1985, contains the following comments:

Initially, I had concerns about the possibility of some organic defects in [D.J.R.] but over the course of time as her anxiety has decreased and I have been able to evaluate her more completely I view her apparent inability to distinguish reality from fantasy more in terms of her early developmental isolation and her attempts to confuse and keep adults at a distance. Intellectually, she is functioning in the dull-normal to borderline retarded range. She has limited ability to organize and work in a constructive fashion on her own. She tends to be tangential and to fabricate stories in the course of normal conversations and has little insight as to the effect of these stories on listeners. She tends to be very angry and alienated. She is unusually detached from her parents and views them in a very negative and hostile light. She has little insight into her own thoughts and feelings, has only a very rudimentary conscience and operates mostly in terms of trying to get what she wants while avoiding punishment for incurring the anger of others. Her most outstanding characteristic is her lack of empathy and feeling for others and her exclusive reliance on internal fantasy life, which is I believe, likely related to early develop-

mental deprivation and lack of an ongoing caring relationship with a responsible adult.

Diagnostically I would describe her as Schizotypal Personality Disorder, a diagnosis which includes bizarre fantasies, social isolation, odd speech and feelings of depersonalization and constricted inappropriate affect. This diagnosis indicates a need for long-term ongoing therapy predicated on the development of a relationship with another person and the focus of that relationship is to help [D.J.R.] understand herself and through that understanding to gain empathy for others and an ability to maintain ongoing relationships and to depend less on internal fantasies and self-preoccupation.

Dr. Meidlinger recommended long-term therapy for D.J.R. and strongly recommended that D.J.R. not be returned to the custody of D.R.

In May 1985, a DHS worker twice contacted D.R. by telephone to discuss the possibility of D.R. coming to visit D.J.R. On both occasions, D.R. stated that he did not want to see D.J.R. and declined to arrange a visit.

In July 1985, D.J.R. was adjudicated a child in need of assistance by stipulation of her guardian ad litem, her parents, and the State. The stipulation and resulting order of the juvenile court expressly did not include any finding of physical or sexual abuse of D.J.R. The stipulation and order did include a no-contact order "prohibiting any contact whatsoever between [DR.] and [D.J.R.] outside a therapeutic setting." D.J.R.'s custody was placed with the DHS for placement commensurate with her needs.

D.J.R.'s status as a child in need of assistance was confirmed by the court after hearings in March and September 1986. Neither D.J.R.'s parents nor her parents' attorney attended these hearings.[4]

---

**3.** This report was later found to be probably untrue and the State now does not rely on physical or sexual abuse as grounds for terminating the parental rights of D.R. and M.R.

**4.** The attorneys representing D.R. and M.R. in this case were not retained until after the termination proceeding had begun.

In September 1987, the State filed a petition to terminate the parental rights of D.R. and M.R. with respect to D.J.R. As grounds for termination, the State alleged abandonment of D.J.R. under Iowa Code section 232.116(1)(b) (1987 & Supp.), as well as the ground set forth in Iowa Code section 232.116(1)(e).[5]

The matter was tried to the juvenile court. On November 1, 1988, the juvenile court entered its findings and order terminating the parental rights of D.R. and M.R. with respect to D.J.R. The court found that the State had proven by clear and convincing evidence that D.J.R. had been abandoned by her parents. In addition, the court found that the State had proven by clear and convincing evidence that the parental rights of D.R. and M.R. should be terminated on the ground set forth in Iowa Code section 232.116(1)(e). Specifically with regard to section 232.116(1)(e)(3), the court found that D.J.R. could not be returned to the custody of her parents as provided by section 232.102 because: 1) she would be imminently likely to suffer physical abuse or neglect; 2) she would be imminently likely to suffer inadequate supervision; 3) she was in need of treatment for serious mental illness, disorder or emotional damage but her parents were unwilling or unable to provide treatment; and 4) she for good cause desired to have her father, at least, relieved of her care and custody. The court found it to be in D.J.R.'s best interest to terminate the parental rights of D.R. and M.R.

The parents' posttrial motions were overruled. D.R. and M.R. appealed.[6]

II. *Sufficiency of the evidence.* In order to terminate a person's parental rights, consistent with the United States Constitution, the State must prove the existence of an otherwise valid ground for termination by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S.Ct. 1388, 1391–92, 71 L.Ed.2d 599, 603 (1982). Our statutes reflect this fact. *See, e.g.,* Iowa Code § 232.116. D.R. argues that his parental rights with respect to D.J.R. cannot be terminated because the State failed to prove the existence of any statutory ground for termination by clear and convincing evidence.

We believe that clear and convincing evidence establishes at least two of the specific statutory grounds relied on by the juvenile court: abandonment of D.J.R. within the meaning of Iowa Code section 232.-116(1)(b), and D.J.R.'s need for treatment to cure serious mental illness, disorder, or emotional damage, for which D.R. is unable or unwilling to provide treatment, under Iowa Code section 232.116(1)(e)(3).

■ A. *Abandonment.* As used in chapter 232, "abandonment of a child" means:

[T]he permanent relinquishment or surrender, without reference to any particular person, of the parental rights, duties, or privileges inherent in the parent-child relationship. Proof of abandonment must include both the intention to aban-

---

**5.** Iowa Code section 232.116(1)(e) provides that termination of parental rights may be ordered if:

The court finds that all of the following have occurred:
(1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
(2) The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months.
(3) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102.
Subsection (3) of section 232.116(1)(e) is satisfied if the court finds by clear and convincing evidence that the child, if returned to the custody of the parents, would be a child in need of

assistance. *In the Interest of A.M.S.,* 419 N.W.2d 723, 725 (Iowa 1988) (construing Iowa Code § 232.116(5)(c) (1985), renumbered § 232.116(1)(e)(3) by 1987 Iowa Acts ch. 159). In this case the State alleged that if returned to her parents' custody, D.J.R. would be a child in need of assistance because she would be imminently likely to suffer physical abuse or neglect; sexual abuse; inadequate supervision; inadequate food, clothing, or shelter; and inadequate satisfaction of her emotional and medical needs. *See* Iowa Code § 232.2(6) (defining "child in need of assistance").

**6.** Because M.R. no longer objects to termination of her parental rights with respect to D.J.R., our discussion will be directed toward D.R.'s appeal and not M.R.'s appeal.

don and the acts by which the intention is evidenced. The term does not require that the relinquishment or surrender be over any particular period of time.

Iowa Code § 232.2(1). Although we realize that D.R. has been subject to a limited no-contact order with respect to D.J.R. since March 1985, we think the evidence is clear and convincing that D.R.'s intentional lack of contact with D.J.R. went so far above and beyond compliance with that order as to amount to abandonment.

The no-contact order in this case expressly provided that D.R. could visit D.J.R. in a therapeutic setting. Thirty months passed between the removal of D.J.R. from D.R.'s home and the filing of the termination petition. Despite numerous contacts by those involved in D.J.R.'s care during that time, D.R. chose not to attend or participate in court review hearings, group home staffings, foster care review board hearings, or therapy. He did not visit D.J.R. even in a therapeutic setting. He did not seek modification of the no-contact order. He chose to sit idly by while social workers and foster parents cared for D.J.R. In March 1987, D.R. and M.R. were ordered to pay the cost of D.J.R.'s care. Neither parent even came to the hearing on the matter. Neither parent paid any part of the support ordered.

In October 1987—thirty-one months after D.J.R. was removed from D.R.'s home and one month after the termination proceeding had begun—D.R. contacted a social worker to express his concern that M.R., who had filed for dissolution of marriage from D.R., would attempt to gain custody of D.J.R. D.R. indicated that he would not contest termination of his parental rights unless M.R. contested the termination of her parental rights. Later that month, D.R. sent a letter addressed to D.J.R. at the group home where D.J.R. then lived. The unopened letter was returned to D.R. by the group home staff, because D.R. still was subject to the limited no-contact order. D.R. still did not seek to have the order lifted or modified.

We find that the State has proven by clear and convincing evidence that D.R.

abandoned D.J.R. with the intent to do so. We emphasize that it is not D.R.'s compliance with the juvenile court's limited no-contact order that leads us to this conclusion. We have stated before that parental responsibility is shown by "affirmative parenting *to the extent it is practical and feasible in the circumstances." In the Interest of Goettsche*, 311 N.W.2d 104, 106 (Iowa 1981) (emphasis added). Thus, it is D.R.'s failure to exercise even the limited visitation rights provided for in the order, coupled with his lack of interest in the judicial and other proceedings concerning D.J.R., that leads us to conclude that abandonment has been established.

We, therefore, reject D.R.'s suggestion that the no-contact order entered in this case is an ironclad defense against the State's allegation of abandonment. The no-contact order is no excuse for D.J.R.'s utter indifference to his daughter's situation as shown by the record before us.

■ B. *D.J.R.'s serious mental illness, disorder, or emotional damage, for which D.R. is unable or unwilling to provide treatment.* Under the Iowa Code, a person's parental rights also can be terminated with respect to a child if: 1) the child has been adjudicated a child in need of assistance pursuant to Iowa Code section 232.96; 2) custody of the child has been transferred from the parent for placement pursuant to Iowa Code section 232.102 for at least twelve of the last eighteen months, and; 3) there is clear and convincing evidence that the child, if returned to the custody of the parent, would be a child in need of assistance. *See* Iowa Code § 232.116(1)(e)(3); *In the Interest of A.M.S.*, 419 N.W.2d 723, 725 (Iowa 1988). An unmarried child is a child in need of assistance if, among other things, the child:

is in need of treatment to cure or alleviate serious mental illness or disorder, or emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior toward self or others and whose parent, guardian, or custodian is unwilling or unable to provide such treatment.

Iowa Code § 232.2(6)(f). This was a ground the juvenile court relied on in terminating D.R.'s parental rights.

D.R. concedes that D.J.R. has been adjudicated a child in need of assistance and that her custody has been transferred from him for at least twelve of the last eighteen months. D.R. argues that there is not clear and convincing evidence that D.J.R., if returned to his custody, would be a child in need of assistance under section 232.-2(6)(f).

We disagree. After viewing the record in this case, it can hardly be doubted that D.J.R. suffered from the requisite serious mental illness or emotional damage when she was removed from D.R.'s custody. D.J.R., a ten-year-old child, had told of being beaten and raped (a story later shown to be probably false). Dr. Meidlinger's report, previously quoted at length, noted that D.J.R. was suffering the effects of "early developmental deprivation" and was "unusually detached" from her parents, whom she viewed in a "negative and hostile light." Dr. Meidlinger believed D.J.R.'s problems stemmed from the "lack of an ongoing caring relationship with a responsible adult." He recommended long-term therapy and the development of a better relationship with someone interested in D.J.R. He strongly recommended that D.J.R. not be returned to D.R.

D.J.R. lived in an institutional setting after being removed from D.R.'s home. While in the State's custody she demonstrated a general inability to socially interact, evidenced at various times by physical and verbal abuse of her peers, lying, stealing, defiance, and temper tantrums. She demonstrated low self-esteem and withdrawal from social relationships. Those entrusted with her care have reported, however, that D.J.R. made slow and steady progress, and in January 1988 she was placed in a foster home.

The juvenile court found that D.J.R. would continue to need close supervision and care to alleviate the emotional damage caused by years of poor parenting. We agree. We reject D.R.'s argument that the court could not make this finding in the absence of testimony that D.J.R. would need psychotherapy to overcome some diagnosed mental illness or disorder. Dr. Meidlinger's report and the reports of D.J.R.'s behavior and progress while in the State's custody lead us to conclude that D.J.R. needs ongoing treatment and care to alleviate serious emotional damage.

The juvenile court further found that there is clear and convincing evidence that D.R. is unable or unwilling to provide the treatment needed by D.J.R. We agree.

Perhaps the best indicator of what to expect from D.R. in the future is what efforts he took to care for D.J.R. in the past. We find it alarming that D.R. thought D.J.R. was retarded or suffering from severe mental problems for two years before Dr. Meidlinger's diagnosis, yet did nothing to alleviate or even look into the problem. Moreover, D.R. has a history of refusing to cooperate with the DHS, the entity which would be able to offer him aid and instruction in caring for D.J.R. There is no evidence that D.R. has done anything to improve his parenting skills or relationship with D.J.R. since her removal. He has refused to take part in D.J.R.'s therapy. There is clear and convincing evidence that D.R. is unable or unwilling to provide treatment needed by D.J.R. to alleviate serious emotional damage.

We conclude that the State proved the existence of statutory grounds for termination of D.R.'s parental rights with respect to D.J.R. by clear and convincing evidence. Furthermore, we agree with the juvenile court that D.J.R.'s best interest would be served by terminating D.R.'s parental rights. *Cf. In the Interest of S.J.,* 451 N.W.2d 827, 831 (Iowa 1990) (child's best interest would not be served by terminating mother's parental rights where mother showed willingness to work to improve parenting skills and faithfully exercised visitation rights during child's separation from her).

III. *Constitutional challenges to termination of D.R.'s parental rights.* In addition to the alleged failure of the State to prove statutory grounds for termination by clear and convincing evidence—an issue

of constitutional dimension after the Supreme Court's decision in *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)—D.R. argues that his constitutional rights were violated in this proceeding in other ways. We address the arguments in turn.

■ **A.** *Substantive due process.* It is well established that "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Id.* at 753, 102 S.Ct. at 1394, 71 L.Ed.2d at 606. For that reason, "state intervention to terminate the relationship between [a parent] and [a] child must be accomplished by procedures meeting the requisites of the Due Process Clause." *Id.*, 102 S.Ct. at 1394, 71 L.Ed.2d at 606 (quoting *Lassiter v. Department of Social Serv.*, 452 U.S. 18, 37, 101 S.Ct. 2153, 2165, 68 L.Ed.2d 640, 656 (1981) (Blackmun, J., dissenting)).

In addition, the substantive dimension of due process dictates that where a fundamental right is involved, regulations limiting the right may be justified only by a compelling state interest, and must be narrowly drawn to express only the legitimate state interest at stake. *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147, 178 (1973).

Finally, the substantive dimension of due process "[bars] certain government actions regardless of the fairness of the procedures used to implement them [and thereby] serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels v. Williams*, 474 U.S. 327, 331–32, 106 S.Ct. 662, 665, 88 L.Ed.2d 662, 668 (1986) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 277, 59 U.S. 272, 277, 15 L.Ed. 372, 374 (1856)). This aspect of due process is violated by government conduct that "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183, 190 (1952).

D.R.'s due process argument does not fit neatly into any one of the three categories mentioned. Relying entirely on the federal district court's opinion in *Alsager v. District Court of Polk County*, 406 F.Supp. 10 (S.D.Iowa 1975), *aff'd* 545 F.2d 1137 (8th Cir.1976), D.R. asserts that termination of his parental rights with respect to D.J.R. violates his right to substantive due process because, in light of the fact that D.R. is "flourishing" in foster care despite the continuance of his parental rights, the State has no compelling interest that would be served by terminating his parental rights. D.R. does not challenge the constitutionality of our statutes; his argument is that the evidence in this case is so deficient that termination would be unconstitutional.

In *Alsager*, parents whose parental rights had been terminated in the Iowa courts challenged the constitutionality of the Iowa termination statutes and their application. *Alsager*, 406 F.Supp. at 12. The federal district court held that substantive due process was violated by termination of the parents' parental rights in that case because the evidence was insufficient to show that the state had a "compelling interest in curtailing the parents' familial rights." *Id.* at 24. In considering the substantive due process challenge, the *Alsager* court wrote:

> Once a child has been removed from the risk of harm, however, as well as in cases where the risks of harm are insufficient to justify a temporary separation, the state's child protection interests are less compelling. Accordingly, the Court deems that termination proceedings should be distinguished from immediate removal proceedings for purposes of substantive due process analysis. The state's interest in protecting a child from future harm at the hands of his or her parents is clearly less compelling in a situation where the state has already obtained temporary protective custody over the child than in those cases where the supposedly threatened child remains in the parent's home.

*Id.* at 22.

For purposes of *substantive* due process, we are not persuaded that the state's interest in protecting a child from future harm at the hands of the child's parents is less compelling where the state has protective custody of the child than where the parent

has custody of the child. Protecting a child from harm is an equally compelling state interest in either case.[7]

The concept of "substantive due process" is not easily defined. We need not establish the exact boundaries of that concept in this case, however, because wherever they lie, the termination of D.R.'s parental rights is well within them. Where valid statutory grounds for termination, such as child abandonment and parental inability or unwillingness to adequately care for the child, are established by clear and convincing evidence, substantive due process is not offended by termination of the parent's parental rights.[8]

D.R. argues that the State has no compelling interest in terminating his parental rights because no harm would be done by allowing his relationship with D.J.R. to continue as it has since 1985 or, conversely, that no benefit would accrue to D.J.R. from having the relationship severed. We disagree. D.R.'s inability or unwillingness to adequately parent D.J.R. has been established. We have long recognized that the best interests of a child are often not served by requiring the child to stay in "parentless limbo". See, e.g., Long v. Long, 255 N.W.2d 140, 146 (Iowa 1977). We agree with the State that D.J.R.'s well-being requires that impediments to her forming new family relationships be swept away.

D.R.'s final argument on the issue of substantive due process is yet another ar-gument directed to the sufficiency of the evidence. D.R. asserts that substantive due process would be violated by termination of his parental rights because there was no showing of his *current*, as opposed to past, parental unfitness.

It is true that a parent who was once unfit may not automatically be deemed forever unfit. *See, e.g., In the Interest of Freund*, 216 N.W.2d 366, 369 (Iowa 1974). But that is not to say that a parent who is found to have abandoned a child may wipe the slate clean by professing the desire to do so. A parent's past conduct may be considered in determining current parental fitness. *See, e.g., In the Interest of Dameron*, 306 N.W.2d 743, 745 (Iowa 1981). The past conduct of D.R., including his conduct during D.J.R.'s separation from him, is the most reliable indicator of D.R.'s current parental fitness. There is no evidence that D.R.'s parenting skills or relationship with D.J.R. have changed. D.R.'s current parental unfitness has been established.

We conclude that D.R.'s right to substantive due process would not be violated by terminating his parental rights with respect to D.J.R.

■ B. *Sixth amendment right to confrontation of witnesses.* During D.J.R.'s testimony at the termination hearing, the court excluded D.R. and M.R. from the courtroom. Counsel for the parties were allowed to be present and to participate in the taking of D.J.R.'s testimony.[9] D.R.

---

7. For purposes of *procedural* due process, however, it is true that less process is due the parent before temporarily removing a child from a home where the child is imminently threatened than is due before permanently terminating a parent's rights with respect to the same child who is already in the state's protective custody. In the latter case, the child is not in risk of imminent harm, a factor which weighs heavily in deciding what predeprivation process is due the parent under the balancing analysis of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

8. Establishment of a valid statutory ground for termination is the showing of parental unfitness arguably necessary to support termination of parental rights. *See Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 555, 54 L.Ed.2d 511, 520 (1978) ("We have little doubt that the Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' ") (dicta) (quoting *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 2119, 53 L.Ed.2d 14, 46–47 (1977) (Stewart, J., concurring in judgment)).

9. Contrary to some of the argument in this case, there apparently is no Iowa statute specifically authorizing the juvenile court to exclude parents from the courtroom at a termination hearing. Iowa Code section 232.38(2), by its terms, applies only to juvenile delinquency proceedings. Nevertheless, the authority of the court to ex-

contends that because the State's petition to terminate parental rights contained allegations of physical abuse, sexual abuse, and neglect, the sixth amendment to the United States Constitution entitled him to confront D.J.R. during her testimony.

The sixth amendment provides, in relevant part:

> In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....

D.R. cites *Coy v. Iowa*, 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), as controlling precedent on this issue.[10]

D.R.'s argument has no merit. *Coy* was a criminal case; this case is civil. By its terms, the sixth amendment applies only to criminal cases. The sixth amendment does not apply to this case. *Cf. In the Interest of L.K.S.*, 451 N.W.2d 819, 822 (Iowa 1989) (sixth amendment does not extend to civil CHINA proceedings).

We hold that a parent has no sixth amendment right to confront a child-witness at a civil termination of parental rights hearing. We reserve other questions, not raised in this appeal, concerning denial of confrontation at such a hearing.

IV. *Conclusion.* We find by clear and convincing evidence that statutory grounds for terminating D.R.'s parental rights with respect to D.J.R. have been established. In light of this finding, we conclude that the State has a compelling interest that would be served by terminating D.R.'s parental rights; therefore, termination would not offend substantive due process. Finally, we conclude that D.R.'s sixth amendment rights were not violated by denying him confrontation of D.J.R. at the termination hearing.

---

clude D.R. and M.R. from the courtroom has only been challenged by D.R. on sixth amendment grounds.

**10.** D.R. did not raise the question in the trial court and, therefore, we do not consider, whether any constitutional guarantee other than that of the sixth amendment requires that a parent be allowed to confront the witnesses against him or her at a termination of parental rights

The parental rights of D.R. and M.R. with respect to D.J.R. are terminated. Costs on appeal are taxed to D.R.

DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.

hearing. *Cf. Lassiter v. Department of Social Serv.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (refusal to appoint counsel for indigent parent in termination of parental rights proceeding not automatically violative of procedural due process guarantee, applying balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).