# IN THE COURT OF APPEALS OF IOWA

No. 14-1374
Filed April 22, 2015

IN THE INTEREST OF K.M.,
Minor Child,

M.M.,
      Petitioner-Appellee,

F.D.,
      Respondent-Appellant.
_____


Appeal from the Iowa District Court for Lee (South) County, Gary R. Noneman, District Associate Judge.


Following a private termination action, the father appeals the district court's termination of his parental rights. **AFFIRMED.**


Curtis Dial of Law Office of Curtis Dial, Keokuk, for appellant.

Bruce C. McDonald of McDonald Law Office, Keokuk, for appellee.


Considered by Vogel, P.J., and Doyle and McDonald, JJ.

**VOGEL, P.J.**

Following a private termination action, the father appeals the district court's termination of his parental rights to his daughter, K.M. He claims the court erred in concluding the mother proved by clear and convincing evidence his rights should be terminated pursuant to Iowa Code section 600A.8(3) (2013), asserting he did not abandon K.M., but rather was prevented from having contact with her due to the mother's actions. He further argues termination is not in K.M.'s best interest. We conclude the father abandoned the child prior to any protective actions by the mother as well as due to his own periods of incarceration. Furthermore, given his extremely violent disposition towards the mother, as well as the lack of a parent-child bond, termination is in K.M.'s best interest. Consequently, we affirm the district court's order terminating the father's parental rights.

**I. Factual and Procedural Background**

The father and mother began a relationship in 2008, when the mother was sixteen and the father was twenty-two. K.M. was born in October 2010. The father's physical abuse of the mother began shortly before she discovered she was pregnant and escalated after she revealed the pregnancy to the father. In one instance, five months into the pregnancy, the father punched the mother in her stomach then, while he was on top of her, stated: "Do you want me to kill you now or later." The mother was injured from the assault but no harm was done to the fetus. The mother obtained a no-contact order against the father, which he violated when he went to the hospital, intoxicated, while the mother was in labor.

He was then incarcerated from October 2010 until May 2011 for a parole violation from a prior criminal conviction.

The father has a significant criminal history, with six felony convictions—including theft, burglary, obstruction of justice, and delivery of a controlled substance (cocaine)—as well as several misdemeanors, including operating while intoxicated. He also has a long history of alcohol and drug abuse.[1] From December 2008 until October 2009 he was incarcerated on his delivery-of-cocaine conviction. As of the May 2014 termination hearing, the father had been incarcerated for a total of thirteen months during the course of K.M.'s life, during which he had no contact with her. Also at the time of the termination hearing, he remained on probation following the 2008 conviction for delivery of cocaine, a condition of which was that he not consume alcohol.

The mother and father attempted a reconciliation between May 2011—following his release from prison—and February 2012, though they did not live together. The mother and child were living at the mother's apartment, the same residence at which they were living at the time of the termination hearing. The father did not have his own place and was residing with different family members. During this time, the mother would occasionally leave K.M. in the father's care

---

[1]The father admitted in his testimony that he was drinking alcohol at the party in which he struck a female friend in the head with a beer bottle. Additionally, according to the GAL's report to the court:

> [The mother] also did testify about concerns regarding [the father's] drinking and stated he drank frequently when the parties were together and had used illegal drugs in front of her while she was pregnant. [The father] did testify to previously using drugs, but stated he doesn't feel he ever had a drug problem.

The father's brother also testified the father has an unresolved alcohol abuse problem, as well as anger management issues, which leads in part to his involvement in criminal activities.

while she worked, but only for a few hours at a time. K.M.'s maternal grandmother provided the majority of child care.

During this brief attempt at reconciliation, the father resumed his abuse of the mother. The mother testified some of this abuse occurred in K.M.'s presence, which caused the child to be "traumatized, scared, [and] bawling." Additionally, in February 2012, the father threw an iPod and hit the mother in the head, severely injuring her face and eye. The last incident prompted the end of the reconciliation, and the father has not seen K.M. since February 2012. The mother also obtained a no-contact order against the father, though the father offered no testimony regarding how it prevented him from fulfilling any parental responsibilities towards K.M. Furthermore, he was incarcerated again from June 2012 until December 27, 2012.[2] At all times K.M. has remained in the mother's care and is, according to the guardian ad litem (GAL), thriving. K.M. does not express any interest in the whereabouts of her father, and the mother stated she does not believe K.M. would recognize him.

The father occasionally contacted the mother when he was not incarcerated, primarily through a few text messages and social media. The father testified that, a week after the no-contact order expired in April 2013, he texted the mother that he would like to see K.M. He stated he sent eight to ten text messages between this time and the May 2014 termination hearing requesting contact, but that the mother never responded. The mother agreed she never responded but stated he only sent four to six messages.

---

[2] The no-contact orders were not made part of the record on appeal.

Further testimony from various witnesses indicated the father left messages on social media berating and denigrating the mother, but at times professing his love for her. The district court observed that: "This behavior is alternately intimidating and manipulative and clearly indicates a high level of vindictiveness and immaturity on the part of the respondent toward [the mother]. This theme of vindictiveness and immaturity also continued with the respondent 'flipping off' [a] witness recently."

At various times between May 2011 and February 2012, the father also made threats to kill the mother and her family if he was denied contact with K.M. The mother believed these threats to be credible. Thus, as the mother testified, she avoided communication from the father in order to assure her and K.M.'s safety. She stated she was afraid the physical abuse would continue, and that she was deeply concerned she would be placing K.M. in physical danger were she to allow contact with the father. This fear was supported by another incident that occurred in April 2014. A mutual friend attempted to intervene between the father and his current paramour at a party, when he was becoming physically abusive towards his girlfriend. In response, the father struck the friend in the head with a beer bottle, breaking the bottle and causing injury to her.

The father filed a petition seeking a custody determination in April 2013. The father's contemporaneous request for temporary visitation, supervised or otherwise, was denied. The mother petitioned the court for termination of the father's parental rights on May 15, 2013. A GAL was appointed for K.M. In the GAL's report to the court, termination was recommended. A hearing was held on May 13 and May 30, 2014, and on July 31, 2014, and the district court entered

an order terminating the father's parental rights pursuant to Iowa Code section 600A.3(b). It further awarded sole custody to the mother. The father appeals.

## II. Scope of Review

We review termination proceedings de novo. *In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct. App. 1999). The grounds for termination must be proved by clear and convincing evidence. *Id.* Our primary concern is the child's best interest. *Id.*

## III. Abandonment

Pursuant to Iowa Code section 600A.2(15), abandonment:

[M]eans to permanently relinquish or surrender, without reference to any particular person, the parental rights, duties, or privileges inherent in the parent-child relationship. The term includes both the intention to abandon and the acts by which the intention is evidenced. The term does not require that the relinquishment or surrender be over any particular period of time.

Our case law further clarifies that abandonment is "a giving up of parental rights and responsibilities accompanied by an intent to forego them." *In re D.M.*, 516 N.W.2d 888, 891 (Iowa 1994) (quoting *In re Burney*, 259 N.W.2d 322, 324 (Iowa 1977)).

As an initial matter, we agree with the father's contention that his interest in parenting his daughter is a fundamental right that is of the utmost importance. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000). Bad behavior, without more, is not a sufficient ground on which to terminate parental rights. *See id.* However, when the statutory factors necessitating termination of parental rights are satisfied, this right can be overridden. *See In re K.M.*, 653 N.W.2d 602, 608–09 (Iowa 2002) (noting: "Focusing on the best interests of the child once the statutory prerequisites for termination [are met]" does not violate due process).

That is the situation in this case. We must determine whether the district court was correct in finding the actions and inactions of the father since the birth of K.M. satisfy the statutory meaning of abandonment under Iowa Code section 600A.8(3)(b), notwithstanding his fundamental right to parent his daughter. *See K.M.*, 653 N.W.2d at 608–09.

Pursuant to Iowa Code section 600A.8(3)(b)(1)–(3), the court may terminate parental rights when:

> The parent has abandoned the child. For the purposes of this subsection, a parent is deemed to have abandoned a child as follows:
> . . . .
> b. If the child is six months of age or older when the termination hearing is held, a parent is deemed to have abandoned the child unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:
> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

At the heart of the father's nearly non-existent relationship with K.M. is his own significant record of criminal activity, drug and alcohol use, anger management issues, and domestic abuse. Even during the parties' brief reconciliation period, the mother stated there were several incidents of abuse. Specifically, one occurrence in December 2011 happened in the following manner:

> One time I was dropping [K.M.] off because I had to go to work, and we had gotten into an argument, and he got really angry at me, and he had me down on the kitchen floor choking me. And [K.M.] had crawled over near us, and he just took me and slammed me up against the couch, was twisting my arm. [K.M.] came over there, crawled over there, and he just kept on trying to take me away from [K.M.]. And he would choke me, yell in my face, scream at me, pull my hair.

The second incident to which the mother testified was when the father threw an iPod at her eye in February 2012. To support her testimony, the mother offered into evidence photographs of her face, which depicted significant bruising around her eye as well as broken blood vessels and a laceration on her cheekbone. Further testimony indicated the father has no compunction about assaulting women with whom he is not intimately involved, as demonstrated when he broke a beer bottle over a friend's head. Other parties also testified to his anger management issues, significant criminal history, and alcohol abuse problem.[3] The father has never sought counseling for any of his problems. The father denied all allegations of abuse. The district court, in sorting out the testimony, came "to the firm, clear, and convincing conclusion that the testimony of the [mother] and her witnesses is not only more truthful and accurate, but that substantial portions of the testimony of the [father] are at best fanciful, if not outright perjurious."

It was also clear to the district court, and to us from this record, that the father's own abusive conduct towards the mother prompted the mother to take protective measures by seeking no-contact orders. Therefore, his own actions led to periods of his "abandonment" of K.M. within the meaning of paragraph

---

[3] The testimony at the hearing established the father has also assaulted his mother and his grandmother—who, at some point, acquired a no-contact order against him.

(3)(b)(1). Moreover, with regard to the first prong set forth in section 600A.8(3)(b), all parties concede the father has not made anything more than token contributions to the financial or physical support of K.M., despite the fact he was steadily employed from July 2011 to the time of the termination hearing. This scant support consisted of purchasing a few diapers and food during the parties' brief attempt at reconciliation, from May 2011 to February 2012.[4] Lack of

---

[4] The mother testified the father rarely provided the necessities for K.M. while she was in his care, evidenced by the following exchange at the termination hearing:

Q: So was this during—was this the job that you were working that [the father] would have been providing some type of care for [K.M.]? A: Not necessarily. Like every once in a while, I'd ask him to buy diapers, baby food.

Q: So she would have still been sleeping in a crib at that time? A: Yes.

Q: And she'd still require a lot of early infant-type things, such as a car seat, high chair, all those types of equipment for a baby; correct? A: Yes.

Q: Okay. So did he have that type of equipment at his home to provide for her, to take care of her? A: I had brought stuff over for [K.M.], so yes.

Q: Okay. So what types of things would you bring over? A: She had an ExerSaucer. I don't think we ever had a highchair, just toys. He had a crib. That was probably it.

Q: Did he have supplies like formula, diapers, clothes, those types of things for her? A: I always provided it.

Q: Did he ever give you money to purchase those things? A: Once in a blue moon.

Q: And how often is once in a blue moon? A: Probably once a month.

Q: And how much would he typically give you? A: He wouldn't necessarily give me money. He would go out and buy, like, a sack full of baby foods and package of diapers.

Q: And about how long would that package of diapers or sack of food last [K.M.]? A: Probably about two weeks.

Q: And did he do this consistently from May 2011 through February of 2012? A: No.

Q: So how often during that time frame would you say? How many times? A: I don't know, a handful.

. . . .

Q: Who bought the things for [K.M.] to prepare for her birth, like the crib, her clothes, and all the things that you would need to prepare for a child's birth? A: Both his and my family.

Q: Did [the father] provide anything? A: Nope.

financial support is clear evidence of abandonment. *See* Iowa Code § 600A.8(3)(b); *see also In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998).

As far as contact is concerned, the father concedes he has not seen K.M. since 2012, and, as the district court noted: "[The father] failed to make any real attempt to be involved in his daughter's life until he filed his petition for custody." The father does argue, in part, that the no-contact order and his incarceration prevented him from establishing a relationship. However, it was necessary for the father to make efforts to maintain contact with K.M.—even with the no-contact order in place—rather than completely relinquish all parental rights and duties. *See In re D.J.R.*, 454 N.W.2d 838, 842 (Iowa 1990) (finding the father abandoned the child because he should have made efforts to contact him, despite the existence of the no-contact order). Moreover, it is well established that incarceration does not excuse the father's nearly complete lack of contact with K.M. *See In re C.A.V.*, 787 N.W.2d 96, 101–02 (Iowa Ct. App. 2010) (holding incarceration was no justification for the father's lack of contact with the child).

Nor do we agree with the father's contention the mother prevented him from maintaining contact with K.M. Our court has affirmed the termination of a father's parental rights in similar circumstances, holding the father abandoned the child—even after making some attempts to contact her—because he did not take steps to assure the mother that he could adequately care for the child, particularly given his criminal history, violent behavior, and substance abuse issues. *In re G.A.*, 826 N.W.2d 125, 129 (Iowa Ct. App. 2012). Our court concluded the mother did not prevent the father from having contact with the

child but, rather, sought reasonable assurances that the child would be safe in his care, which the father did not provide. *Id.* at 129–30. It further held that: "Although we find the mother did not prevent visitation, assuming arguendo that the mother had prevented visitation, section 600A.8(3)(b)(2) requires the father to maintain regular communication with the child or the child's custodian. He did not affirmatively attempt regular communication with the child." *Id.* Thus, the court concluded the nearly nonexistent contact, combined with a complete lack of financial support, amounted to abandonment, despite the father's attempt to procure a custody determination from a court shortly before the termination petition was filed. *Id.* at 130.

The situation here is similar, and the record demonstrates the mother did not prevent the father from having contact with K.M. within the meaning of section 600A.8(3)(b)(1). Rather, as in *In re G.A.*, the mother was reasonably concerned the father could not properly care for K.M., given his extremely violent past and significant criminal history. The father, instead of taking steps to reassure the mother he could safely parent K.M., left abusive messages on social media. This does not rise to the level of a meaningful attempt to reinitiate contact with K.M., as the mother reasonably feared for K.M.'s safety if she were left alone with the father. *See id.* Nor has the father made any attempt to address his domestic violence or other issues through counseling. Thus, as the GAL noted:

> It is true that [the mother] stopped contact between [the father and his] family and [K.M.] after [the father] filed for custody, but I believe her concerns were valid. The history and volatility between the parties is very extreme and not something to be revisited for [K.M.] . . . . I believe [the father] knows he made mistakes and now has to

do something to protect himself in this circumstance. I don't believe this should occur at the expense of [K.M.'s] physical or emotional well-being.

While we note the mother and father had a brief reconciliation period in which he occasionally cared for K.M. while the mother worked, this period ended after several instances of the father again assaulting the mother—causing severe injury—occasionally in the presence of K.M. Thus, the mother continued to be justified in her concerns the father could not care for K.M. without also subjecting K.M. to harm. Additionally, as our court has noted, section 600A.8(3)(b)(2) requires the father to maintain consistent and meaningful contact with K.M. *See id.*; *see also G.A.*, 825 N.W.2d at 129. A few sporadic text messages over the period of a few months, alongside disparaging social media posts, do not rise to any sort of meaningful contact that may fend off a claim of abandonment, particularly given the father did not attempt any other type of communication—or offer financial or emotional support—to K.M.

## IV. Best Interests

Furthermore, it is clearly in K.M.'s best interest that the father's rights be terminated. *See R.K.B.*, 527 N.W.2d at 601 (noting the court must consider whether termination is in the child's best interest). He is extremely abusive towards women and, as evidenced by his testimony at the hearing, refuses even to acknowledge his violent past, let alone seek counseling. Within this context, the district court noted:

> Basically, any woman who displeases him can reasonably expect to be hit, insulted, and injured. This is of grave concern to the court should he obtain any type of regular contact with not only [the mother], but also with [K.M.]. Little girls do grow up and children, especially teenagers, develop personalities and minds of their own.

Would an act of young adolescent defiance be met with the same treatment that was meted out to the mother by the respondent?

Another important consideration—and as established by the record—is that the father has no compunction about physically abusing the mother in front of K.M. This behavior is extremely detrimental to the child's emotional and psychological well-being, and it is a clear indication the father will allow K.M. to be subjected to harm. *See In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998) (noting the best-interests consideration is "designed to prevent probable harm to the child").

Another fact counseling for termination is the lack of a parent-child bond. The father concedes he has not seen K.M. since 2012. The record also demonstrates K.M. is not comfortable while in the father's care and does not make any inquiries regarding her father. It is further encouraging that K.M. is thriving with the mother, without any involvement from the father. Given these facts, we conclude the district court properly concluded termination of the father's parental rights is in K.M.'s best interest. *See id.*

For these reasons, we affirm the order of the district court terminating the father's parental rights to K.M.

**AFFIRMED.**